# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | **TO BE FILED UNDER SEAL** |
| | : | |
| v. | : | Hon. Leda Dunn Wettre |
| | : | |
| MARK BELTER, | : | Mag. No. 20-13401 |
| DAVID C. LAUGHLIN, JR., and | : | |
| STEPHEN LUKE | : | **CRIMINAL COMPLAINT** |
| | : | |

I, Meghan Marino, being duly sworn, state the following is true and correct to the best of my knowledge and belief:

### SEE ATTACHMENT A

I further state that I am a Special Agent with the Department of Defense—Office of Attorney General, and that this Complaint is based on the following facts:

### SEE ATTACHMENT B

continued on the attached pages and made a part hereof.

s/ Meghan Marino
_____
Meghan Marino, Special Agent
Dept. of Defense—Office of Inspector General

Special Agent Marino attested to this Affidavit
by telephone pursuant to F.R.C.P. 4.1(b)(2)(A).

September 8, 2020, at
District of New Jersey

*Leda Dunn Wettre*

HONORABLE LEDA DUNN WETTRE     _____
UNITED STATES MAGISTRATE JUDGE    Signature of Judicial Officer

## ATTACHMENT A
### (Conspiracy to Violate the Federal Anti-Kickback Statute)

From in or about January 2016 through in or about July 2019, in the District of New Jersey and elsewhere, defendants

**MARK BELTER,
DAVID C. LAUGHLIN, JR., and
STEPHEN LUKE**

did knowingly and intentionally conspire and agree with each other and others to commit certain offenses against the United States, that is:

(a) to knowingly and willfully solicit and receive remuneration, specifically, kickbacks and bribes, directly and indirectly, overtly and covertly, in return for referring individuals for the furnishing and arranging for the furnishing of any item and service for which payment may be made in whole or in part by a Federal health care program, and in return for purchasing, leasing, ordering, and arranging for and recommending purchasing, leasing, and ordering any good, facility, service, and item for which payment may be made in whole or in part under a Federal health care program, contrary to Title 42, United States Code, Section 1320a-7b(b)(1)(A)-(B); and

(b) to knowingly and willfully offer and pay remuneration, specifically kickbacks and bribes, directly and indirectly, overtly and covertly, in cash and in kind, in return for referring individuals for the furnishing and arranging for the furnishing of any item and service for which payment may be made in whole or in part by a Federal health care program, and in return for purchasing, leasing, ordering, and arranging for and recommending purchasing, leasing, and ordering any good, facility, service, and item for which payment may be made in whole or in part under a Federal health care program, contrary to Title 42, United States Code, Section 1320a-7b(b)(2)(A)-(B).

In violation of Title 18, United States Code, Section 371.

## ATTACHMENT B

I, Meghan Marino, a Special Agent with the Department of Defense—Office of Inspector General ("DoD-OIG"), having conducted an investigation and having discussed this matter with other law enforcement officers who have participated in this investigation, have knowledge of the following facts. Because this Complaint is being submitted for the limited purpose of establishing probable cause, I have not included each and every fact known to me concerning this investigation. Rather, I have set forth only the facts that I believe are necessary to establish probable cause. Unless specifically indicated, all dates described in this affidavit are approximate and all conversations and statements described in this affidavit are related in substance and in part.

### Relevant Individuals and Entities

1. At various times relevant to this Criminal Complaint:

   a. Defendant Mark Belter ("BELTER") lived in North Ridgeville, Ohio.

   b. Defendant David C. Laughlin, Jr. ("LAUGHLIN") lived in Buckeye, Arizona.

   c. Defendant Stephen Luke ("LUKE") lived in Phoenix, Arizona.

   d. Ethan Welwart ("Ethan Welwart") lived in North Brunswick, New Jersey.

   e. William Welwart ("William Welwart") lived in Staten Island, New York.

   f. Elan Yaish ("Yaish") lived in Cedarhurst, New York.[1]

   g. RediDoc LLC ("RediDoc") was incorporated in Arizona and had its principal place of business in Phoenix, Arizona. RediDoc was a purported telemedicine company doing business throughout the United States and was owned and operated by LAUGHLIN and LUKE.

   h. Health Pain Solutions, LLC ("HPS") was incorporated in Ohio and had its principal place of business in North Ridgeville, Ohio. HPS was a purported marketing company doing business throughout the United States and was owned and operated by BELTER.

---

[1] Ethan Welwart, William Welwart, and Elan Yaish were charged by criminal complaint with conspiracy to violate the Anti-kickback Statute on or about September 2, 2020 in the District of New Jersey in *United States v. Ethan Welwart et al.*, Mag. No. 20-12359 (JBC).

    i. Apogee Bio-Pharm LLC ("Apogee") was incorporated in New Jersey and had its principal place of business in Edison, NJ.  Apogee was a purported pharmacy doing business throughout the United States and was owned and operated by Ethan Welwart, William Welwart, and Yaish.

    j. "Beneficiaries" were individuals covered under Federal health care benefit programs, as defined under 18 U.S.C. § 24(b), including Medicare and TRICARE (both described further below), which provided benefits that covered durable medical equipment ("DME"), and their associated pharmacy benefit managers, which provided benefits that covered prescription medications.

    k. "Marketing Companies" were companies around the country, like HPS, that maintained direct relationships with pharmacies like Apogee, co-conspirator DME providers, and telemedicine companies like RediDoc. Through these relationships, in the conspiracy described below, the Marketing Companies directed Beneficiaries' prescriptions for medications to Apogee and other pharmacies and sent DME orders to co-conspirator DME providers. In return, the pharmacies like Apogee and co-conspirator DME providers paid the Marketing Companies a percentage of the reimbursement amount that they received from Federal health care benefit programs on each claim.

    l. "Telemedicine Companies" were companies around the country, including RediDoc, that purportedly provided telemedicine services to individuals by hiring doctors who signed prescriptions for medication or supplied orders for DME.  The Telemedicine Companies maintained direct relationships with Marketing Companies, which provided the Telemedicine Companies with information about Beneficiaries who, in the conspiracy described below, had supposedly consented to receive certain medications or DME.  In exchange, the Marketing Companies like HPS paid the Telemedicine Companies like RediDoc a fee per prescription for medication, order for DME, or both.

### Medicare and TRICARE

    m. The Medicare Program ("Medicare") is a federal program that provides free or below-cost health care benefits to certain individuals, primarily the elderly, blind, and disabled.

    n. Medicare was divided into four parts that helped cover specific services: hospital insurance (Part A); medical insurance (Part B); Medicare Advantage (Part C); and prescription drug benefits (Part D). Medicare Part B covered medically necessary physician office services and outpatient care, including the ordering of DME, such as ankle braces, knee braces, back braces, elbow braces, wrist braces, and hand braces. Medicare Part D provided coverage for the cost of prescription drugs for individuals on Medicare. This coverage is managed by pharmacy benefit managers and other private companies approved by Medicare.

o.   TRICARE was a health care benefit program of the United States Department of Defense ("DoD") Military Health System that provided health insurance coverage for active duty military service members, National Guard and Reserve members, retirees, their families, and survivors.

p.   Both Medicare and TRICARE (and its pharmacy benefits manager) were "health care benefit programs" that affected commerce as defined in 18 U.S.C. § 24(b) and "federal health care programs" as defined in 42 U.S.C. § 1320a-7b(f).

### Telemedicine

q.   Telemedicine provided a means of connecting patients to health care providers by using telecommunications technology, such as video or the telephone.

r.   Telemedicine companies hired physicians and other health care providers to furnish telemedicine services to individuals. Telemedicine companies typically paid health care providers a fee to conduct consultations with patients. In order to generate revenue, telemedicine companies typically either billed Medicare or other health insurance program, or offered a membership program to customers.

s.   Medicare Part B covered expenses for specified telehealth services if certain requirements were met. These requirements included (a) that the beneficiary was located in a rural area (outside a Metropolitan Statistical Area or in a rural health professional shortage area); (b) that the services were delivered via an interactive audio and video telecommunications system; and (c) that the beneficiary was at a practitioner's office or a specified type of medical facility—not at a beneficiary's home—during the telehealth service furnished by a remote practitioner.

### The Conspiracy

2.   From as early as in or about January 2016 through in or about July 2019, BELTER, LAUGHLIN, LUKE, Ethan Welwart, William Welwart, Yaish, and others, conspired to enrich themselves and others by submitting false and fraudulent claims to federal health care benefit programs—predominantly Medicare—based on a circular scheme of kickbacks and bribes paid, solicited, and received from each other and others.

3.   In sum, BELTER identified Beneficiaries and targeted them for specific prescription medications or DME and sent the Beneficiaries' information to RediDoc; BELTER then paid LAUGHLIN and LUKE at RediDoc kickbacks for each signed prescription and doctor's order they collected for those Beneficiaries; LAUGHLIN and LUKE in turn paid RediDoc's contracted doctors kickbacks for each prescription and doctor's order they signed; LAUGHLIN and LUKE then

transmitted the prescriptions to Apogee and doctor's orders to DME providers, who submitted claims for reimbursement to federal health care benefit programs; and Ethan Welwart, William Welwart, and Yaish at Apogee paid BELTER kickbacks for originating the Beneficiaries' claims.

4. To carry out the conspiracy, the conspirators engaged in a variety of means and methods and committed or caused to be committed certain overt acts including, among others, those described below.

5. Marketing Companies like HPS identified Beneficiaries and targeted them for prescriptions for often medically unnecessary but expensive medications and DME. The medications typically included pain creams, scar creams, and migraine medication, while the DME generally consisted of braces for the wrist, shoulder, knee, and ankle. BELTER at HPS and other Marketing Companies received Beneficiary information from various sources, and the information usually included the Beneficiary's personal and health insurance information.

6. After identifying target Beneficiaries, HPS telephoned them, purportedly to obtain the Beneficiaries' medical history and consent to receive medications or DME. The true purpose of these calls was so that BELTER and others could record these conversations with the Beneficiaries and convince them to try certain medications or DME. Those recordings were then used in the next step of the telemedicine scheme to support fraudulent prescriptions or doctor's orders (which is used to prescribe DME).

7. The individuals who called the Beneficiaries and recorded those calls, including BELTER, generally had no medical licenses or training. BELTER and other callers from HPS routinely told the Beneficiaries that the medication or DME would be provided to them at no cost and that they would not be responsible for paying a co-payment.

8. At the conspirators' direction, the callers purposely did not tell the Beneficiaries what doctor would prescribe the medication or DME. The conspirators believed that the Beneficiaries may not consent to receive medication or DME from an unknown doctor. In an email to William Welwart and another Apogee employee on or about January 15, 2018, BELTER wrote that, when he called Beneficiaries, he did not provide specifics: "I think you might lose some people [Beneficiaries] when you mention a Doctor name they have never heard of." In the same email, even though the Beneficiary calls were purportedly initial consultations taking place before a doctor visit, BELTER told William Welwart that he would tell the Beneficiaries: "Ms. Jones you were approved for your prescriptions!!!" BELTER also told William Welwart that he would emphasize to the Beneficiaries that the medications and DME would be supplied to them at no cost: "People [Beneficiaries] are mostly ALL on low income . . . and cant afford a copay at

6

all," so BELTER typically assured Beneficiaries that a third-party "assistance program" would cover the co-payment.[2]

9. After obtaining the Beneficiary's medical history and purported consent, BELTER at HPS transmitted a Beneficiary intake form, the recorded call, and a pre-filled prescription for medication or DME order (the "Beneficiary Package") to Telemedicine Companies like RediDoc.

10. The prescriptions were issued from digital prescription pads used by Apogee and HPS that included a pre-populated checklist of medications. To decide what medications were included on the pre-filled digital prescription pads, Apogee engaged in "test billing," a practice where Apogee sent claims to health care benefit programs to discover how much a health care benefit program would reimburse for a particular medication.

11. The digital prescription pads were designed for easy use. For example, the pads contained check boxes next to each medication or combination of medications to increase the likelihood that the physician would not change the prescription, which could lower the reimbursement amount and cause pharmacies like Apogee to receive less money from the scheme. The digital prescription pads also allowed the doctor to select, in some cases, five refills or more. Finally, the pads typically had a check box that allowed the physician to authorize Apogee or another pharmacy to substitute or change the prescribed medication to an alternate one covered by the Beneficiary's insurance. If the physician checked this box, Apogee could substitute a comparable medication—without consulting the physician again—to ensure that the Beneficiary's insurance would reimburse Apogee for medication.

12. HPS and RediDoc operated under a contract, signed by BELTER and LUKE, which spelled out the kickback arrangement between them. Specifically, the contract called for HPS to pay RediDoc a fee of approximately $95 for each prescription that RediDoc obtained from one of its contracted doctors; $100 for each DME order; and $115 for a prescription and a DME order.

13. RediDoc recruited and contracted with doctors to whom RediDoc disseminated the Beneficiary Packages. RediDoc's doctors were located in dozens of states around the country. RediDoc paid its contracted doctors anywhere from $7 to $30 per "consultation," depending on whether they prescribed medication, DME, or both. For example, according to one contract between a doctor ("Doctor-1") and RediDoc, which was signed by LUKE on or about May 22, 2018, RediDoc agreed to pay Doctor-1 $15 per "consultation" by telephone with no prescription; $20 per "consultation" resulting in a medication prescription or DME order; and $30 per "consultation" resulting in a medication prescription and DME order. RediDoc had

---

[2] Communications referenced within this Complaint are described as written, including any typographical or grammatical errors.

7

similar contracts with doctors across the country and paid them over $5,500,000 from bank accounts controlled by LAUGHLIN and LUKE during the scheme.

14. RediDoc employees told doctors that if they could not reach the Beneficiaries by telephone, reviewing the Beneficiary Packages alone was sufficient to make a prescribing decision. For example, on or about January 9, 2017, LAUGHLIN exchanged emails with a physician ("Doctor-2") in which LAUGHLIN tried to recruit Doctor-2 to the scheme. RediDoc had worked with Doctor-2 previously. When Doctor-2 asked LAUGHLIN about the process for conducting "consultations," LAUGHLIN responded, "Same process, recording, intake and RX [prescription] pad. $20 a patient but more volume. Does this work for you?" Doctor-2 then asked, "Do I have to call them?," referring to whether Doctor-2 had to call the Beneficiaries to properly administer telemedicine. LAUGHLIN replied, "Not unless you want to."

15. As a result of RediDoc's business arrangement with HPS, other Marketing Companies, and doctors, both LAUGHLIN and LUKE were concerned that they were violating federal law by receiving and paying kickbacks. For example, on or about November 12, 2017, LUKE emailed LAUGHLIN with the subject line "We should stop all Federal Programs now to be safe" and providing the punishments and penalties associated with violations of the federal Anti-Kickback Statute in the body of the email. Despite this warning, LAUGHLIN and LUKE continued to routinely send Medicare Beneficiaries to its doctor network and to transmit prescriptions and DME orders for them to its contracted pharmacies and DME providers.

16. When RediDoc sent its contracted doctors Beneficiary Packages, it typically asked the doctor to return the signed prescriptions and orders within 48 hours. Based on directions from LAUGHLIN and others at RediDoc, its doctors often signed prescriptions and DME orders without ever having physically examined, seen, or communicated in any fashion with the Beneficiaries. They also generally did not communicate with the Beneficiaries' primary care physicians or consult their medical history beyond the information contained in the Beneficiary Packages. The doctors also rarely if ever investigated whether the Beneficiary lived in a rural area or a place appropriate for telemedicine or verified that the Beneficiary was located outside the home.

17. At the direction of LAUGHLIN and LUKE, RediDoc also did not bill the health care benefit programs, including Medicare, for its services. Likewise, its doctors generally did not bill health care benefit programs for the "consultations" that they were supposedly conducting.

18. In total, during the course of the scheme, BELTER disbursed approximately $978,000 to RediDoc bank accounts controlled by LUKE and LAUGHLIN for the prescriptions and DME orders RediDoc obtained through its doctor network. RediDoc, through bank accounts controlled by LUKE and

LAUGHLIN, received an additional approximately $20 million from other Marketing Companies for providing prescriptions and DME orders from its doctors.

19.     Once the RediDoc doctors signed the prescriptions or DME orders, they were entitled and received kickbacks from RediDoc.  At the direction of HPS and other Marketing Companies, RediDoc then disseminated the prescriptions or orders to dozens of pharmacies and DME providers around the country.  The chosen pharmacy or DME provider had nothing to do with their proximity to the Beneficiary or the Beneficiary's choice.  HPS routinely directed prescriptions to Apogee.

20.     Once Apogee received the signed prescriptions from RediDoc, it filled the prescriptions and distributed them from New Jersey to Beneficiaries across the country, including California, Nevada, New Mexico, Colorado, and Texas.  Apogee was barred by at least one Medicare PBM from mailing prescription medication.

21.     Ordinarily, the medications filled by Apogee and other pharmacies and marketed as part of the conspiracy were selected based on their high reimbursement amounts—not medical necessity. Specifically, a disproportionate number of the prescriptions were for medications with National Drug Codes that were reimbursed by health care benefit programs, including Medicare, for several thousand dollars. Additionally, the prescriptions involved extremely large quantities of medication that were highly unlikely to be used by a single patient in the time period prescribed. For example, single prescriptions presented by RediDoc and filled by Apogee called for 300 grams of lidocaine 5% ointment for use within 25 to 30 days—an atypical quantity of lidocaine to use in that time period.

22.     Apogee generated exorbitant revenues during the years it maximized the reimbursements it received from dispensing the medications it received from RediDoc and others.  For example, in 2016, before Apogee began receiving large quantities of prescriptions from RediDoc, it was reimbursed approximately $1.3 million by Medicare.  However, in 2017, when Apogee started receiving prescriptions through RediDoc, its revenues increased to $3.65 million.  And, in 2018, when almost all of Apogee's prescriptions were generated by RediDoc and others, its reimbursements from Medicare skyrocketed to over approximately $22 million.  The reimbursement money was transferred from Medicare and its pharmacy benefit managers into a bank account controlled by William Welwart and Ethan Welwart.

23.     At the direction of William Welwart and Yaish, Apogee sought to take advantage of filling prescriptions for refills without the need for an additional prescription from a doctor.  For example, on or about July 6, 2018, BELTER emailed William Welwart and Yaish and wrote: "Looking through AUTO refill numbers I still see the % of patients getting any refills is low."  In the same email, BELTER stated, "Lets talk about this--- I think this gives us a situation where we get every patient there first prescription and we have recording where they automatically get

first refill--- then we call them before sending out additional [refills] or if on recording they requested all 3 refills we set them up on auto refill…" Yaish emailed BELTER on or about the same day and wrote, "Your idea sounds interesting. . . . We also have some ideas as we are feeling the same pain as you regarding refills." On or about the following day, BELTER emailed William Welwart and Yaish and wrote, "We just need to figure out a plan for refills it has been such a huge loss of money through Apogee. It is money we both can make and is right there."

24. Apogee and HPS had an agreement that called for Apogee to pay HPS approximately 50% of the reimbursement Apogee received from Medicare and other health care benefit programs for every claim that HPS originated. Under that agreement, in an email dated October 17, 2017, Yaish sent to William Welwart and another Apogee employee a "Marketing Consulting Payor spreadsheet" that included data for October 1 through October 15, 2017. The spreadsheet listed six "Marketing Groups," including HPS, and showed the number of prescriptions (24) that Apogee had filled that originated with HPS during the relevant time period. In the last column, the spreadsheet indicated that Apogee had earned a gross profit of $12,619.37 on the 24 prescriptions, and, as a result, Apogee owed HPS a 50% commission of approximately $6,309.69. Five other Marketing Companies were included on the Apogee spreadsheet circulated by Yaish, and it indicated that Apogee was paying them similar commissions on prescription referrals ranging from 50% to 70% per reimbursed claim. Yaish sent a similar spreadsheet to William Welwart and Ethan Welwart on April 14, 2019, showing that Apogee owed HPS approximately $72,961.04 for the March 16 through March 31, 2019 time period.

25. Over the course of the scheme, bank accounts controlled by William Welwart and Ethan Welwart transferred over $6 million to a bank account controlled by BELTER.

26. In total, the Defendants and other co-conspirators caused the submission of false and fraudulent claims to health care benefit programs, including Medicare and TRICARE, totaling in excess of $75 million for prescription medication and DME. Those claims were ineligible for federal health care benefit program reimbursement because they were procured by paying kickbacks and bribes.

10