2023R00239/KMR/HMB

# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | Hon. Esther Salas |
| | : | |
| | : | Crim. No. 23-358 |
| v. | : | |
| | : | <u>Count 1</u> |
| | : | 18 U.S.C. § 371 |
| MARK BELTER | : | (Conspiracy to Violate the Anti-Kickback Statute) |
| | : | |
| | : | <u>Count 2</u> |
| | : | 18 U.S.C. § 371 |
| | : | (Conspiracy to Commit Health Care Fraud) |

## <u>I N F O R M A T I O N</u>

The defendant having waived in open court prosecution by Indictment, the Attorney for the United States, Acting Under Authority Conferred by 28 U.S.C. § 515, charges:

### <u>COUNT 1</u>
### (Conspiracy to Violate the Anti-Kickback Statute)

### <u>Overview of the Conspiracy</u>

1. From at least as early as in or about June 2017 through on or about September 8, 2020, Defendant MARK BELTER and others worked together with pharmacies, telemedicine companies, and doctors to unlawfully profit by submitting and causing to be submitted false and fraudulent claims to federal health care benefit programs based on a circular scheme of kickbacks and bribes paid to, and solicited and received from, each other and others. In total, defendant BELTER and other

conspirators caused the submission of false and fraudulent claims to health care benefit programs totaling in excess of $24 million for prescription drugs. Those claims were ineligible for federal health care benefit program reimbursement, in part, because they were procured through fraud and through the payment of kickbacks and bribes.

**The Defendant and Other Individuals and Entities**

2.  Unless otherwise indicated, at all times relevant to this Information:

    a.  BELTER was a resident of North Ridgeville, Ohio.

    b.  Health Pain Solutions, LLC (HPS) and Midwest Pharmacy Consulting, LLC (MPC) were companies located in North Ridgeville, Ohio.

    c.  Midwest Medical Network, LLC (MMN) was a company located in Avon, Ohio.

    d.  HPS, MPC, and MMN were purported marketing companies doing business throughout the United States and were owned and operated by BELTER and James Feeley, a co-conspirator not charged in this Information.

    e.  RediDoc LLC was a company located in Phoenix, Arizona. RediDoc was a purported telemedicine company doing business throughout the United States, and was owned and operated by Stephen Luke and David Laughlin, two co-conspirators not charged in this Information.

    f.  Apogee Bio-Pharm LLC (Apogee) was a pharmacy located in Edison, New Jersey that purportedly did business throughout the United States by filling prescriptions and shipping them to patients. Apogee was owned and operated

by William Welwart, and Elan Yaish and Ethan Welwart helped operate the pharmacy. William Welwart, Yaish, and Ethan Welwart are co-conspirators not charged in this Information.

### Medicare and TRICARE

g. Medicare was a federally funded program established to provide medical insurance benefits for individuals age 65 and older and certain disabled individuals who qualified under the Social Security Act. Individuals who received benefits under Medicare were referred to as "Medicare beneficiaries."

h. Medicare was divided into four parts: hospital insurance (Part A); medical insurance (Part B); Medicare Advantage (Part C); and prescription drug benefits (Part D). Medicare Part D provided coverage for the cost of prescription drugs for individuals on Medicare. Part D coverage was managed by pharmacy benefit managers and other private companies approved by Medicare.

i. TRICARE was a federal health care benefit program for the United States Department of Defense (DoD) Military Health System that provided health insurance coverage for DoD beneficiaries worldwide, including active-duty military service members, National Guard and Reserve members, retirees, their families, and survivors. The Defense Health Agency, an agency of the DoD, oversaw and administered TRICARE.

j. Both Medicare and TRICARE (and their pharmacy benefits managers) were "health care benefit programs" that affected commerce as defined in

18 U.S.C. § 24(b) and "federal health care programs" as defined in 42 U.S.C. § 1320a-7b(f). "Beneficiaries" were individuals covered by these programs.

### Telemedicine

k. "Telemedicine" refers to the practice of medicine by doctors using telecommunications technology, such as video or telephone, to connect with patients. Telemedicine companies, like RediDoc, hired doctors and other health care providers, purportedly to furnish telemedicine services to patients.

### The Conspiracy

3. From in or about June 2017 through on or about September 8, 2020, in the District of New Jersey and elsewhere, defendant

**MARK BELTER**

knowingly and intentionally conspired and agreed with Luke, Laughlin, William Welwart, Yaish, Ethan Welwart, and others known and unknown, to commit certain offenses against the United States, namely:

(a) to knowingly and willfully solicit and receive remuneration, directly and indirectly, overtly and covertly, in cash and in kind, that is, kickbacks and bribes, in return for referring an individual to a person for the furnishing and arranging for the furnishing of any item and service, namely, the referral of prescriptions, for which payment may be made in whole and in part under a federal health care program, namely, Medicare, contrary to Title 42, United States Code, Section 1320a-7b(b)(1)(A); and

4

(b) to knowingly and willfully offer and pay remuneration, directly and indirectly, overtly and covertly, in cash and in kind, that is, kickbacks and bribes, to any person to induce such person to refer an individual to a person for the furnishing and arranging for the furnishing of any item and service, namely, to doctors for signing prescriptions, for which payment may be made in whole and in part under a federal health care program, namely, Medicare, contrary to Title 42, United States Code, Section 1320a-7b(b)(2)(A).

### Goal of the Conspiracy

4. The goal of the conspiracy was for BELTER and his co-conspirators to unlawfully profit by receiving kickbacks and bribes from pharmacies, including Apogee, in exchange for prescriptions for expensive drugs. BELTER and others then paid kickbacks and bribes to telemedicine companies, including RediDoc, which the telemedicine companies in turn paid to doctors so that the doctors would sign expensive prescriptions. BELTER and others steered the doctors' prescriptions to specific pharmacies which they had agreements with. The pharmacies then submitted claims to federal health care benefit programs for which they received lucrative reimbursements.

### Manner and Means of the Conspiracy

5. It was part of the conspiracy that:

a. BELTER, acting through HPS and his other marketing companies, identified Beneficiaries to target for expensive drugs. These drugs typically included pain creams, scar creams, eczema creams, and migraine

5

medication. The Beneficiaries whom HPS identified were referred to as "leads." BELTER received Beneficiary information from various sources, including overseas call centers, and the information usually included the Beneficiary's personal and health insurance information.

        b.     After identifying leads, HPS called them to pressure them to agree to try expensive medications—regardless of medically necessity. Belter and others at HPS during these calls would deliberately conceal the name of the prescribing doctor—whom the Beneficiary had never met before—to increase the likelihood that the Beneficiary would agree to accept the medications. Portions of these calls were recorded.

        c.     HPS then transmitted to RediDoc, and other telemedicine companies, the Beneficiaries' medical information and the recorded phone calls. HPS also sent pre-marked prescription pads for particular drugs that would yield exorbitant reimbursements, pads which HPS had received from pharmacies like Apogee.

        d.     HPS paid RediDoc a kickback for each Beneficiary referred for a prescription, and HPS paid RediDoc more if multiple prescriptions were filled.

        e.     Luke and Laughlin, through RediDoc, in turn paid doctors and other health care providers to approve the pre-written prescriptions that they had received from HPS. RediDoc paid the doctors on a per-patient basis based on how many Beneficiary "consultations" the doctors did. Typically, the amount paid to the doctors ranged from approximately $20 to $30 per "consultation." The doctors often

approved the prescriptions without having had any contact with the Beneficiary and without making a *bona fide* assessment that the medications were medically necessary.

    f.  BELTER knew that the RediDoc doctors often did not contact patients or legitimately assess their need for the prescriptions. Nevertheless, RediDoc secured thousands of prescriptions for HPS from its doctors, who were located in dozens of states around the country, including New Jersey, and for which RediDoc paid the doctors several million dollars in total. After securing signed prescriptions, Luke and Laughlin, through RediDoc, steered the prescriptions to Apogee and other pharmacies around the country at BELTER's direction. BELTER directed prescriptions for patients from all over the country to specific pharmacies with whom BELTER had kickback arrangements, including Apogee.

    g.  Apogee and other pharmacies then sought to fill and dispense the pharmaceutical products, and the pharmacies submitted claims for reimbursement to health care benefit programs. Once the pharmacies received reimbursement, they sent a portion of the proceeds to BELTER and HPS as payment for the prescriptions that BELTER and HPS had paid RediDoc to generate.

    h.  During the conspiracy, BELTER arranged to pay RediDoc, from the HPS bank account, at least approximately $998,460 in kickback and bribe payments for prescriptions that RediDoc facilitated through its paid doctors.

i. In total, BELTER and his marketing companies, including HPS, received kickbacks and bribes totaling more than approximately $6,168,155 from Apogee in exchange for the prescription referrals.

**Overt Acts**

6. In furtherance of the conspiracy and to achieve its illegal objectives, BELTER and others committed, and caused to be committed, the following overt acts in the District of New Jersey and elsewhere:

a. On or about October 2, 2017, HPS entered into a contract, signed by BELTER, in which Apogee agreed to pay HPS "Fifty Percent (50%) of the amount collected on each adjudicated shipped claim, billed at an hourly rate for services rendered whether an initial prescription or refill." Despite the language in this contract, HPS did not bill Apogee at an hourly rate. Instead, Apogee paid HPS fifty percent of the reimbursement received from federal benefit programs.

b. On or about the approximate dates listed below in June 2018, BELTER, through HPS, sent RediDoc nine payments totaling approximately $112,500, each of which represented a bribe and kickback to RediDoc for prescriptions that were provided:

| Date | Amount |
|---|---|
| 6/4/2018 | $12,500 |
| 6/6/2018 | $12,500 |
| 6/8/2018 | $12,500 |
| 6/12/2018 | $10,000 |
| 6/18/2018 | $15,000 |
| 6/19/2018 | $15,000 |
| 6/22/2018 | $10,000 |
| 6/25/2018 | $15,000 |
| 6/29/2018 | $10,000 |

c. On or about the approximate dates listed below in July 2018, BELTER, through HPS, sent RediDoc eight payments totaling approximately $87,500, each of which represented a bribe and kickback to RediDoc for prescriptions that were provided:

| Date | Amount |
|---|---|
| 7/2/2018 | $10,000 |
| 7/2/2018 | $10,000 |
| 7/3/2018 | $10,000 |
| 7/5/2018 | $10,000 |
| 7/6/2018 | $15,000 |
| 7/10/2018 | $10,000 |
| 7/13/2018 | $20,000 |
| 7/23/2018 | $2,500 |

d. On or about October 23, 2018, BELTER sent an email to RediDoc, asking RediDoc to send prescriptions for approximately 35 patients from around the country, including California, Colorado, and Texas, among other states, to Apogee located in New Jersey. These were patients that had obtained prescriptions through RediDoc based on information that HPS had provided to RediDoc, including insurance information and pre-written prescriptions for each patient.

e. BELTER regularly communicated with representatives from Apogee by email regarding the amounts received by Apogee by health care benefit programs. Specifically, BELTER often inquired about claims Apogee submitted for filling prescriptions that BELTER and HPS had directed to Apogee and therefore how much money Apogee owed BELTER and HPS. For example, on or about January 11, 2018, BELTER emailed representatives from Apogee, including William Welwart, regarding Beneficiaries who declined prescriptions and stated, "If I knew about these

9

patients within 2-4 days I could call and get them on the phone/help process them through so we don't lose them." In that email, BELTER stated that in the prior month, "[HPS] made maybe $120,000 from Apogee and I feel that number should have been over $200,000 but instead I lost $30,000 in scripts just sitting there."

In violation of Title 18, United States Code, Section 371.

## COUNT 2
## (Conspiracy to Commit Health Care Fraud)

7. The allegations contained in paragraphs 1-2 and 4-6 of Count 1 are realleged here.

8. From in or about June 2017 through on or about September 8, 2020, in the District of New Jersey and elsewhere, defendant

## MARK BELTER

knowingly and intentionally conspired and agreed with others to knowingly and willfully execute a scheme and artifice to defraud health care benefit programs, including Medicare and TRICARE, which were health care benefit programs as defined under 18 U.S.C. § 24(b), and to obtain, by means of false and fraudulent pretenses, representations, and promises, money and property owned by, and under the custody and control of, a health care benefit program in connection with the delivery of and payment for health care benefits, items, and services, contrary to Title 18, United States Code, Section 1347.

### Goal of the Conspiracy

9. The goal of the conspiracy was for BELTER and his co-conspirators to profit by defrauding health care benefit programs by causing them to pay for expensive prescription medications regardless of medical necessity.

### Manner and Means of the Conspiracy

10. It was part of the conspiracy that:

   a. BELTER, Feeley, Luke, Laughlin, William Welwart, Yaish, Ethan Welwart and others generated prescriptions regardless of medical necessity to

11

be approved by doctors being paid kickbacks by RediDoc. At BELTER's direction, HPS purchased lists of Beneficiaries and then cold-called and pressured the Beneficiaries to accept prescription medications. BELTER, HPS, and the pharmacies with whom they had relationships, including Apogee, chose particular drugs for their prescriptions largely based on reimbursement amount and not medical need.

    b.  BELTER and HPS sent information about the Beneficiaries, including a prescription on a pre-marked prescription pad created by Apogee and others, to RediDoc, which then arranged for the pre-marked prescription to be signed by a doctor whom RediDoc was paying. The doctors paid by RediDoc often signed prescriptions without ever speaking to the patient, which BELTER was aware of.

    c.  Once RediDoc's doctors had signed the prescriptions regardless of medical necessity, RediDoc then transmitted them to pharmacies, including Apogee, around the country for fulfillment.

    d.  Once the pharmacies filled the prescriptions and were reimbursed by health care benefit programs, the pharmacies, including Apogee, sent a portion of the reimbursement amount to marketing companies, including BELTER and HPS.

    e.  To increase the amount of Medicare and TRICARE reimbursements, BELTER encouraged Apogee to convince Beneficiaries to agree to accept automatic refills of the presecriptions, even though the refills were likely to result in additional medication being dispensed to patients who did not need it.

    f.  BELTER and HPS sales representatives also deceived Beneficiaries into accepting medication by purposely not mentioning the name of the

doctor who would sign the Beneficiaries' prescription, and by providing false information to the Beneficiaries about the cost of the medications. BELTER encouraged Apogee to do the same when Apogee communicated with Beneficiaries.

    g.  Apogee representatives including William Welwart, Yaish, and Ethan Welwart set up one or more purported "copay assistance programs" to cover Beneficiaries' copay obligations, in order to persuade the Beneficiaries to accept medications regardless of medical necessity. BELTER touted the purported "copay assistance programs" in conversations with Beneficiaries.

## Overt Acts

  11. In furtherance of the conspiracy and to achieve its illegal objectives, BELTER and others committed, and caused to be committed, the following overt acts in the District of New Jersey and elsewhere:

    a.  On or about December 6, 2017, BELTER emailed Apogee employees regarding the impact that copays could have on securing the Beneficiaries' consent to receive prescriptions and refills. BELTER wrote to the Apogee employees that a Beneficiary recently refused medication because the Beneficiary had been asked to pay a copay. BELTER stated: "Often patients will not have funds to pay copay – So I always tell them if a copay is due there is a copay assistance program which will reduce the copay to Zero if they qualify."

    b.  On or about January 11, 2018, BELTER emailed representatives of Apogee, including William Welwart, regarding a strategy to encourage patients to enroll in automatic refill, stating: "My bet is 80-90% of the people getting their

prescriptions will say sure on AUTO FILL. **** If you send cream out and wait 24 days and call and say hey Mr. [Beneficiary] you have a refill available for your prescription pain cream do you need us to send it out. – 80%-90% will say NO I have plenty at the moment. Thank you anyway… SO just by doing this simple step is the differen[ce] in hundreds of thousands of dollars per month."

      c.     On or about January 15, 2018, BELTER emailed an Apogee employee and William Welwart, and stated that when BELTER called Beneficiaries, he deliberately avoided specifics to increase the likelihood of the Beneficiaries consenting: "I think you might lose some people [Beneficiaries] when you mention a Doctor name they have never heard of." In the same email, BELTER wrote that he would tell the Beneficiaries in the calls: "Ms. Jones you were approved for your prescriptions!!!" and that he would emphasize to the Beneficiaries that the medications would be supplied to them at no cost: "People [Beneficiaries] are mostly ALL on low income . . . and cant afford a copay at all."

      d.     BELTER encouraged Apogee to provide Beneficiaries with refills regardless of medical necessity. In the same email on or about January 15, 2018, BELTER stated: "If you wait and call them back in 23-30 days and say we have a refill for your cream 85% will say I have 2 tubes still or I am not ready yet……-(If you want refills it should be set up for the 2-3 on first call)."

      e.     On or about November 7, 2018, BELTER sent an email to a marketer whom BELTER used to help secure the purported consent of Beneficiaries. In the email, he described how to manipulate the Beneficiary recording process to

highlight the portion where the Beneficiary purportedly agreed to receive the medication and to conceal any other parts of the conversation: "We need you to have separate recordings.  We only need the COMPLIANCE RECORDING – If your reps need to stop and restart recording for compliance part that is great.  I do not want to have long calls and have to cut them and so on.  So please we only need the compliance script recordings.  (These will go onto our telemedicine)."

   f. On or about July 7, 2018, BELTER emailed Yaish and William Welwart stating, "We just need to figure out a plan for refills it has been such a huge loss of money through Apogee.  It is money we both can make and it is right there."

 In violation of Title 18, United States Code, Section 371.

## **FORFEITURE ALLEGATION**

1. The allegations in Counts 1 and 2 of this Information are realleged here for the purpose of alleging forfeiture.

2. Upon conviction one or both of the Federal health care offenses (as defined in 18 U.S.C. § 24) alleged in Counts 1 and 2 of this Information, BELTER shall forfeit to the United States, pursuant to 18 U.S.C. § 982(a)(7), all property, real and personal, BELTER obtained that constitutes or is derived, directly and indirectly, from gross proceeds traceable to the commission of such offense, including, but not limited to, a sum of money equal to $4,102,352.75.

## **SUBSTITUTE ASSETS PROVISION**

3. If any of the above-described forfeitable property, as a result of any act or omission by BELTER:

   a) cannot be located upon the exercise of due diligence;

   b) has been transferred or sold to, or deposited with, a third party;

   c) has been placed beyond the jurisdiction of the court;

   d) has been substantially diminished in value; or

   e) has been commingled with other property which cannot be divided without difficulty,

it is the intent of the United States, pursuant to 21 U.S.C. § 853(p), as incorporated by 18 U.S.C. § 982(b), to seek forfeiture of any other property of the defendant up to the value of the forfeitable property described above.

*Vikas Khanna*
VIKAS KHANNA
Attorney for the United States
Acting Under Authority
Conferred by 28 U.S.C. § 515

CASE NUMBER: 23-358

# United States District Court
# District of New Jersey

**UNITED STATES OF AMERICA**

v.

**MARK BELTER**

# INFORMATION FOR
18 U.S.C. § 371

**VIKAS KHANNA**
ATTORNEY FOR THE UNITED STATES
ACTING UNDER AUTHORITY
CONFERRED BY 28 U.S.C. § 515
NEWARK, NEW JERSEY

KATHERINE M. ROMANO
ASSISTANT U.S. ATTORNEY
(973) 353-6095